IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

STEVEN BIVENS, *on behalf of himself and all persons similarly situated*,

      Plaintiff,

v.

SELECT PORTFOLIO SERVICING, INC.,

      Defendant.

CIVIL ACTION FILE NO.

1:15-cv-4325-ELR-JKL

## FINAL REPORT AND RECOMMENDATION

This action, brought under the Real Estate Settlement Procedures Act ("RESPA"), is presently before the Court on Defendant Select Portfolio Servicing, Inc.'s ("SPS") motion for summary judgment. [Doc. 61.] Plaintiff Steven Bivens alleges that SPS did not respond appropriately to a QWR because its response contained indecipherable codes and did not include a full account history from his two prior servicers. [Doc. 29.]

As explained below, the Court concludes that Bivens cannot establish a RESPA claim here because he cannot show any causal connection between his

claimed damages and SPS's failure to adequately respond to his request for his entire account history or to provide codes to interpret his account history. The Court therefore **RECOMMENDS** that SPS's motion for summary judgment be **GRANTED**.

## I.      SUMMARY JUDGMENT STANDARD

A court should grant summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of showing that it is entitled to summary judgment. *Id.* ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (holding that *Celotex* did not change the rule that the movant bore the initial burden, and stating, "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial").

The movant may carry its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.  The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation omitted); *see* Fed. R. Civ. P. 56(c).  "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  In evaluating a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id.* at 255.

3

## II.   BACKGROUND

The following statement of facts is presented in the light most favorable to Bivens.  In setting out the relevant facts of this case, where possible, the Court relies on the Defendant's Statement of Undisputed Material Facts ("DSUMF") [Doc. 61-1] and Plaintiff's responses thereto ("Response-DSUMF") [Doc. 69].  SPS also has filed a reply to Bivens' response ("Reply-DSUMF") [Doc. 72-1].  Any fact to which no objection was filed is deemed undisputed.

In 2006, Bivens borrowed money from Mortgage Lenders Network USA, Inc. ("MLN") to purchase residential property in Sugar Hill, Georgia.  (DSUMF ¶ 1.)  He made payments on the loan to MLN through December 2006, and in January 2007, he started paying Countrywide.  (*Id.* ¶¶ 2-3.)  Servicing of the loan was later transferred to Bank of America.  (*Id.* ¶ 4.[1])  In 2009, MLN was dissolved in bankruptcy.  (*Id.* ¶ 5.)

---

[1] Bivens argues that he "does not know if Bank of America was ever authorized to service his loan, only that it claimed to be.  (Response-DSUMF ¶ 4.) He takes the same approach with SPS.  (*Id.* ¶ 7.)  The Court understands that Bivens doubts that SPS is his servicer or believes it lacks the authority to service his loan (Dep. of Steven Bivens [Doc. 62] at 33, 86), but in his objection, he cites no factual support for that position.  The objections to those facts are therefore overruled.

In 2010, Bivens stopped making payments on his loan,[2] and he has not made a payment since then.  (DSUMF ¶ 6.)  While he was still making payments, he had tried to work out a loan modification with Bank of America to lower his interest rate, but Bank of America did not modify his loan.  (Bivens Dep. at 60, 62.)  In 2010 or 2011, someone told him that he had "the golden ticket" and he was eligible for a settlement because there was something wrong with his loan.  (*Id.* at 62.)

SPS became the servicer for Bivens's loan in 2012.  (DSUMF ¶ 7.)  That year, Bivens filed a state court "quiet title" action, in which he also asserted conclusory allegations that SPS and other defendants failed to respond adequately to qualified written requests ("QWRs") in violation of RESPA.  *Bivens v. MLN, et al. ("Bivens I")*, No. 1:13-cv-3979-ODE, Doc. 1-1 at 23-28.  That case was removed to this Court, and the action, including the RESPA claims against SPS, were dismissed.  *Bivens I*, Docs. 1, 36.  In 2014, Bivens sued SPS and other defendants in this Court, alleging as relevant here that SPS failed to adequately respond to a QWR.  *Bivens v. Bank of America, N.A., et al. ("Bivens II")*, No. 1:14-cv-1569-ODE, Doc. 1.  As an attachment to his complaint, Bivens filed his account

---

[2] Bivens had two loans from MLN: one for $114,320 and one for $28,580. *Bivens I*, Doc. 1-1 at 24.  Only the first loan is relevant to this case.  (*See* Bivens Dep. Ex. 1, Ex. 2.)

history from Bank of America, showing his account history from January 2007 to September 2012. (DSUMF ¶ 4[3]); *Bivens II*, Doc. 1-2 at 14-18. The account history from Bank of America shows that his principal balance in September 2012 was $113,675.84, and he had a negative escrow balance of $10,863.06. *Bivens II*, Doc. 1-2 at 18.

The District Court granted summary judgment to SPS on Bivens's RESPA claim on the grounds that Bivens did not send his request to the right mailbox; that it was not a QWR because it requested information unrelated to the servicing of the loan, namely, information about the ownership of the note; that SPS adequately responded to the letter; and that Bivens suffered no damages. *Bivens II*, Doc. 97. The Eleventh Circuit affirmed the District Court's grant of summary judgment because Bivens did not send his QWR to the proper address and declined to reach the other grounds for granting summary judgment in the District Court's order. *Bivens II*, 868 F.3d 915 (11th Cir. 2017).

---

[3] In Bivens's view, he had "a copy" of his account history, but not "the copy," because SPS later sent him a more detailed account history. (Response-DSUMF ¶ 10.) SPS responds that the account payment histories were substantially the same. (Reply-DSUMF ¶ 10.) This is one of Bivens's main arguments about the adequacy of SPS's response to his request for an account history, but for the reasons explained below, any difference between the account histories is immaterial.

While *Bivens II* was in the discovery phase, on March 25, 2015, Bivens sent SPS a letter with the following seven requests:

(1) On the attached letter from you dated December 15, 2012, the letter states: "We are unable to assist you because: Loan is not modifiable." Why is this loan not modifiable?

(2) On the attached screen shot from ABS Net it shows this loan has a foreclosure date of 10/1/2011 and a REO date of 3/1/2013. Why does it show this? Was this loan foreclosed? Is this loan now REO?

(3) Please send me a listing of all payments received and charges made to this account since the execution of the note with the reasons for any charges to the account.

(4) Why does the attached "Assignment of Security Deed" state that MERS transferred the note to the SASCO Trust on 6-23-2011?

(5) Why does the attached "Transfer and Assignment of Deed to Secure Debt" state that MERS transferred the note to the SASCO Trust on the 13th day of October, 2011?

(6) Please send me information showing the complete chain of transfer of the loan promissory note. Please identify each holder of the note and the date of transfer from each holder.

(7) Please send me some confirmation from the current note holder that you are its agent.

(DSUMF ¶ 11; Bivens Dep. Ex 3.)

Before he sent the March 2015 letter, Bivens had received multiple payment histories from Bank of America, but he believed every payment history he had

received was "incomplete." (Bivens Dep. at 152-53.) Bivens requested the account history because he was "entitled to it" because he "want[ed] to understand" his monthly statements from SPS. (DSUMF ¶ 13; Response-DSUMF ¶ 13.) He does not think it is appropriate for SPS to send him a monthly statement demanding mortgage payments if it cannot send him a proper account history. (Bivens Dep. at 109.) Although he believes that his account is "all wrong," he has not identified what he suspects the error or error in his account to be. (DSUMF ¶ 13.) Bivens also suggested during his deposition that he asked SPS for his complete account history because he thinks that, if SPS cannot validate the debts it services, its actions as a loan servicer may unlawful. (Bivens Dep. at 76-81.) For Bivens, "the question . . . is what does SPS have from the previous servicer from Bank of America and the answer is nothing, except – an incomplete payment history." (*Id.* at 221.)

SPS consulted its outside counsel, Locke Lord LLP ("Locke Lorde"), who are also counsel for SPS in this action, before responding to Bivens's March 2015 letter. (DSUMF ¶¶ 14-16.) SPS's legal department, with assistance from Locke

Lord, investigated SPS's responses to Bivens's letter.[4]  (DSUMF ¶ 17.)  On April

7, 2015, Locke Lord sent a letter to Bivens's counsel acknowledging receipt of the

letter dated March 25, 2015.  (DSUMF ¶ 15.)  On May 12, 2015, SPS, through

Locke Lorde, sent its response to the March 25 letter to Bivens's counsel.  (*Id.* ¶

16.)  As relevant here, in response to Request Number 3, SPS stated:

> SPS began servicing the Loan on December 1, 2012.  An account
> history showing that no payment for the Loan has been received by
> SPS since it began servicing the Loan on December 1, 2012 and
> showing the charges that have been made to the account since that date
> is enclosed with this letter.

(DSUMF ¶ 18.)

The Payment History Report enclosed with SPS's response shows Bivens's

account history from December 2012 to April 2015.  (DSUMF ¶ 19.)  Taking the

facts in the light most favorable to Bivens, the details of the payment history report

are virtually incomprehensible.  (Feb. 2017 Dep. of Mark Syphus Ex. 6 [Doc. 70-

---

[4] Bivens objects to this fact on the grounds that it is inadmissible hearsay.
(Response-DSUMF ¶ 17.)  The Court does not see why this fact, which is based on
the testimony of SPS's Rule 30(b)(6) witness (Mar. 2017 Dep. of Mark Syphus
[Doc. 61-5] at 7, 12), could not be reducible to an admissible form at trial.  SPS
could call a member of SPS's legal department to testify that the department
consulted outside counsel and investigated Bivens's request for information before
responding.  The objection is therefore overruled.  In any event, the fact is included
here only for context.

5].)  Some charges were assessed against the account over the two-and-a-half year period, such as insurance payments, but the exact nature of each charge is not clear. SPS's starting balance for Bivens's account in December 2012 appears to have the same principal and negative escrow balance that Bank of America had as of September 2012.  The report clearly shows that he has a principal balance of $113,675.84.  The negative escrow balance from the Bank of America is accounted for on SPS's report as "Escrow Amt" and appears as two separate entries (-$863.07 and -$9,999.99) as "Escrow Pmt," but these items are not easy to identify.  (*See id.*)

On December 14, 2015, Bivens filed his initial class action complaint in this matter.  [Doc. 1.]  He alleged that his March 2015 letter was a QWR and SPS's response was deficient under RESPA for two reasons: (1) the Payment History Report was incomplete "because it is missing payments and charges to the account for a period of six years"; and (2) "it is incomprehensible because the information that was provided is all in code without any key to the codes."  [*Id.* at 3.]  Bivens alleged a bare procedural violation of RESPA but did not allege that he suffered any actual damages based on SPS's allegedly deficient response.  [*See id.* at 1-7.] Bivens also included allegations related to "pattern or practice" damages and class certification.  [*Id.* at 4-7.]

10

On February 1, 2016, Bivens met with Rod Carnes, Deputy Commissioner for Non-Depository Institutions for the Georgia Department of Banking and Finance.   (DSUMF ¶ 29.)   When Bivens arranged the meeting, Deputy Commissioner Carnes understood that Bivens wanted to show him some documents or give him an update.  (Dep. of Derrell "Rod" Carnes [Doc. 66] at 58-59.)   Bivens testified that he arranged the meeting with Deputy Commissioner Carnes "[t]o show him the garbage that I got from SPS and see if he could make heads or tails of the account history.  And if he couldn't could he assist me." (Bivens Dep. at 244.)  He wanted to discuss with Deputy Commissioner Carnes the notion that "if [SPS] can't give you a simple breakdown of your bill and what the charges and credits are, do they have the right to be the servicer?"  (*Id.* at 250.)

At the meeting, which was his third or fourth meeting with Deputy Commissioner Carnes, Bivens discussed "[t]he missing account histories and the incomprehensible account history."  (Decl. of Steven Bivens [Doc. 68-12] ¶ 4; Bivens Dep. at 244.)  But he also discussed topics unrelated to the account history, and he was primarily concerned with whether SPS was the owner or servicer of the loan and whether he could "get a clear title" to the property secured by the loan. (Carnes Dep. at 48-49.)

11

On February 4, 2016, Bivens faxed a letter to SPS requesting, *inter alia*, "the rest of the account history that was not sent with the May 12, 2015 letter." (DSUMF ¶ 38; Bivens Dep. Ex. 10.)  He also requested "the reason" for part of the escrow balance and "the reason for each of the other charges and credits listed in the account history you provided with the May 12, 2015 letter" but did not specifically request a key to the codes in the Payment History Report he previously was sent.  (DSUMF ¶ 40; Response-DSUMF ¶ 40; Bivens Dep. Ex. 10.)  The February 4 fax was the first time that Bivens requested additional information from SPS about its responses to the March 2015 letter.  (DSUMF ¶ 39.)

SPS sent a request to Bank of America for Bivens's payment history. (DSUMF ¶ 41.)  SPS also informed Bivens that it would need additional time to respond to some of the requests in his February 2016 letter, including the request for "the rest" of the payment history.  (DSUMF ¶¶ 42-43.)  SPS received an account history from Bank of America that covered his account history dating back to January 2007.  (DSUMF ¶ 44.)  On April 8, 2016, SPS sent this new information to Bivens.  (DSUMF ¶¶ 45-46.)  The new version of Bank of America's account history (Bivens Dep. Ex. 14) is more detailed than the one Bivens had in 2014 (*Bivens II*, Doc. 1-2 at 14-18), in that it contains descriptions of miscellaneous fees

12

charged to Bivens that were not part of his principal balance, interest payments, or escrow balance.  Many of those fees were refunded.

Bivens faxed a letter to SPS on April 20, 2016, requesting his account history from before January 16, 2007—the time when he was paying MLN directly. (DSUMF ¶ 47; Bivens Dep. Ex. 15.)  In his letter, he reiterated some of his previous requests for information and asked for more detail about some of SPS's responses, but did not specifically request a code sheet for his account history.  (Bivens Dep. Ex 15.)  Bivens later stated that he sent the February 4, 2016 fax and the April 20, 2016 fax "to get the information that SPS had not sent in its response to" his March 25, 2015 letter.  (Bivens Decl. ¶ 5.)

In a letter dated June 2, 2016, SPS responded that it needed additional time to respond to Bivens's inquiry.  (DSUMF ¶ 48.)  It also provided a transaction code listing for the original Payment History Report and another version of his account history, the Financial Breakdown Statement, for the period during which SPS serviced the loan.  (*Id.*; Bivens Dep. Ex. 16.)  On June 23, 2016, after attempting without success to obtain the pre-2007 loan history from Bank of America, SPS wrote to Bivens and informed him that it had not received any documents responsive to his request.  (DSUMF ¶¶ 49-50; Feb. 2017 Syphus Dep. Ex. 19 [Doc.

13

70-18].)  It stated, "SPS has provided you the account history within its custody or control."  (DSUMF ¶ 50; Feb. 2017 Syphus Dep. Ex 19.)

Bivens is not confused about his payment history for 2006, when he was paying MLN.  (DSUMF ¶ 23.)  He does not have any documents that might show his 2006 loan payments were misapplied, but he is not certain they were applied correctly or if MLN added any other charges.  (DSUMF ¶ 27; Bivens Decl. ¶ 6.)  He requested his payment history for 2006 to show that SPS does not have the complete payment history and "is not doing things right."  (DSUMF ¶ 24.)  He wanted to see what information SPS "ha[d] from the previous servicer from Bank of America."  (DSUMF ¶ 25.)

At his deposition, Bivens was asked why he did not follow up with SPS about the allegedly deficient response between May 2015 and December 2015, when he filed this lawsuit.  He answered:  "I don't know if it was mediation, I mean, I don't know if it was timing, what [my lawyer] was doing or what I was doing, but I don't know.  I don't have a good answer for that."  (Bivens Dep. at 184-85.)  He later clarified that point in a declaration submitted with his response to the motion for summary judgment.  He stated that he did not follow up because he "hoped" to

14

obtain the missing information in discovery in his 2014 lawsuit.  (Bivens Decl. ¶ 3.)[5]

On June 1, 2016, the Court issued a report and recommendation, recommending that Bivens's complaint be dismissed for failure to allege that he suffered any actual damages, which are a necessary component of a RESPA claim. [Doc. 17.]  On June 6, 2016, Bivens moved to amend his initial complaint to add allegations showing actual damages.  [Docs. 19, 19-1.]  The Court granted the motion for leave to amend, and Bivens's amended complaint became the operative pleading in this matter.  [Docs. 24, 28, 29.]  In the amended class action complaint, Bivens alleges that his letter dated March 25, 2015 was a QWR, and SPS failed to respond adequately to his request.  [Doc. 29 at 3.]  Specifically, he alleges, the Payment History Report SPS provided was incomplete because it was missing six

_____

[5] Bivens has submitted a statement of additional material facts with his response to the motion for summary judgment ("PSMF" [Doc. 68-1]).  The additional facts are immaterial and contain impermissible legal argument, and SPS's objections to those facts are sustained [Doc. 72-2].  PSMF ¶¶ 1 through 4 and 8 bear on the question of who owns Bivens's promissory note and whether SPS should have sent Bivens a copy of his note, which is not germane to the RESPA claim here.  PSMF ¶¶ 5 and 9 relate to the mailbox where SPS's customers send QWRs and are also immaterial to the issues in this case.  PSMF ¶ 6 is an impermissible legal conclusion that Bivens has suffered actual damages.  PSMF ¶ 7 is about whether a December 2012 letter was a QWR and is immaterial to the resolution of the issues here.

years of the payment history, and it was incomprehensible because the information was all in code, and SPS failed to provide a key to the codes.  [*Id.*]  He alleges that he incurred damages because of this inadequate response by incurring travel costs to meet with Deputy Commissioner Carnes and by incurring travel costs and expenses to fax his February 16, 2016 and April 20, 2016 follow-up faxes.  [*Id.* at 3-4]; (*see also* DSUMF ¶ 55).   The amended complaint also contains allegations pertinent to statutory damages and class certification.  [Doc. 29 at 4-8.]

On April 27, 2017, SPS moved for summary judgment on Bivens's individual claims.[6]  [Doc. 61.]  Bivens has filed a response [Doc. 68], and SPS has filed a reply [Doc. 72.]  The motion is now ripe for review.

## III.   THE PARTIES' ARGUMENTS

In its motion for summary judgment, SPS does not challenge that Bivens's contention that his March 2015 letter was a QWR.  [*See* Doc. 61-2.]  It argues that it adequately responded to Bivens's letter because his request for his entire account

---

[6] Following a scheduling conference with the parties, the Court deferred class discovery and class certification until after the resolution of any dispositive motions on Bivens's individual claims, and Bivens withdrew him motion for class certification.  [Docs. 37, 38, 40.]  Because the Court recommends granting the motion for summary judgment as to Bivens's individual claims, the Court does not reach the question of whether a class should be certified.

history was irrelevant, as it was duplicative of other information he already had, and was overbroad.  [*Id.* at 10-14.]  It argues that the request for an account history was not a request for "salient" information about his loan, but rather, a request for documents in the vein of a discovery request.  [*Id.* at 13-14.]  Moreover, Bivens never requested a code sheet from SPS.  [*Id.* at 14-15.]

SPS further argues that Bivens cannot show he is entitled to relief under § 2605(e) because he has suffered no actual damages and cannot establish a causal connection between any claimed damages and the allegedly deficient response to his QWR.  [Doc. 61-2 at 15-19.]  Bivens's follow-up requests for information and his meeting with Deputy Commissioner Carnes were remote in time from the allegedly deficient response, and in any event, Bivens already had an account statement from Bank of America knew how much he had paid on his loan in 2006. [*Id.* at 15-16.]  The meeting with Deputy Commissioner Carnes was scheduled for purposes other than obtaining a complete payment history or a means of deciphering the account history he had from SPS.  [*Id.* at 18.]  SPS argues that Bivens's testimony shows he was not damaged by SPS's response to his March 25, 2015 letter, and some of his claimed damages were manufactured for the purpose of creating grounds to pursue this lawsuit.  [*Id.* at 16-19.]  Finally, SPS argues that

Bivens cannot show statutory damages without showing actual damages, and he cannot show a pattern or practice of RESPA noncompliance.  [*Id.* at 19-24.]

Bivens responds that SPS violated RESPA by not providing an intelligible account history from SPS or any account history from Bank of America or MLN in its response to the March 25, 2015 letter.  [Doc. 68.]  He argues that he needed his complete account history to ask questions about charges to his account and make or confirm corrections to his account, and he is entitled to that information so that he can make sure his entire account is correct.  [*Id.* at 6-16.]  He argues that SPS had a duty to conduct a reasonable investigation for his MLN account history and to notify him if it could not obtain the information, but it could not ignore part of his request.  [*Id.* at 11-12.]  Moreover, the account history SPS sent him in the Payment History Report was incomprehensible, with or without the codes, notwithstanding his request in the March 25, 2015 letter for "the reasons for any charges to the account."  [*Id.* at 12-16.]  He adds that SPS violated RESPA by not providing him with appropriate contact information for an SPS employee who can assist him because no one in SPS's customer service department will speak with him.  [*Id.* at 16-18.]

Bivens contends that he was damaged by SPS's failure to provide him with a complete, intelligible account history because he incurred costs in sending follow-up requests to SPS and in traveling to meet with Deputy Commissioner Carnes. [Doc. 68 at 18-21.]  He argues that SPS could have cured its deficient response in the eight months before he incurred any damages.  [*Id.*]   Bivens also argues that SPS is liable for statutory damages.  [*Id.* at 21-25.]

In reply, SPS argues that Bivens's argument about its failure to provide useful contact information for an SPS employee who will speak to Bivens is not properly before the Court.  [Doc. 72 at 2.]  He also cannot show that SPS violated RESPA by failing to provide such contact information or that the claimed violation caused him damages because he has been in active litigation with SPS throughout the time relevant to this lawsuit.  [*Id.* at 2-4.]  SPS also reiterates its arguments that Bivens cannot show that its response to his March 25, 2015 letter violated RESPA, that it caused him any damages, or that he is entitled to statutory damages.  [*Id.* at 4-13.]  It argues that the Court should disregard Bivens's declaration because it lacks substantial "additional facts," although it does not cite any legal basis for doing so.  [*Id.* at 9.]

## IV.   DISCUSSION

To state a claim under RESPA for failure to adequately respond to a QWR, a plaintiff must show that: (1) the defendant is a loan servicer, (2) the plaintiff sent the defendant a valid QWR, (3) the defendant violated RESPA by failing to adequately respond within the statutory period, and (4) the plaintiff incurred damages.  *See Katica v. Specialized Loan Servicing, LLC*, No. 1:15-CV-2957-ODE-WEJ, 2015 WL 10765188, at *5 (N.D. Ga. Dec. 1, 2015), *report and recommendation adopted*, 2016 WL 1746176 (N.D. Ga. Mar. 9, 2016); *see also* 12 U.S.C. § 2605(f); *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016).  In this case, two of those elements are in issue: (1) whether SPS violated RESPA; and (2) whether Bivens suffered damages as a result of that violation.  For the reasons that follow, the Court finds that there is a genuine issue of material fact for trial as to the question of whether SPS violated RESPA, but Bivens cannot show that he was damaged by the violation.  SPS is therefore entitled to summary judgment on his RESPA claim.

### A.   There is a genuine dispute of material fact as to whether SPS's responses to Bivens's requests were proper under RESPA.

RESPA "imposes a duty on servicers of mortgage loans to acknowledge and respond to inquiries from borrowers."  *Bivens II*, 868 F.3d at 918 (citing 12 U.S.C.

§ 2605(e)).   When a borrower submits a QWR, the servicer must (1) provide a written response acknowledging receipt of the correspondence and (2) take other responsive actions within specified time periods.  *Id.*

Regulation  X,  RESPA's  primary  implementing  regulation,  provides  a detailed scheme for servicer to use when responding to requests for information. 12 C.F.R. § 1024.36.   As relevant here, within 30 days after the receipt of a borrower's QWR requesting information, the servicer must provide an appropriate response to the information request by providing the borrower with the requested information or conducting a reasonable search or the requested information and providing the borrower with written notification that the servicer has determined that the requested information is not available to the servicer.  *Id.* § 1024.36(d); *see also*  12  U.S.C.  § 2605(e)(2)(C).   The  servicer  does  not  need  to  provide  the requested information or conduct an investigation if it determines, *inter alia*, that the request for information is duplicative of information the servicer has already provided the borrower, is irrelevant because it is not "directly related" to the borrower's  mortgage  loan  account,  or  the  request  is  overbroad  or  unduly burdensome.  12 C.F.R. § 1024.36(f)(1)(i), (f)(1)(iii), (f)(1)(iv).  To invoke one of those exceptions, the servicer generally must provide notice of the borrower within

21

five days of making the determination that the exception applies. *Id.* § 1024.36(f)(2).

A reasonable factfinder could find that, in his March 25, 2015 letter, Bivens requested his entire account history—including the period when Bank of America and MLN were his servicers—by asking for his account history "since the execution of the note," (Bivens Dep. Ex. 3), and that SPS did not comply with RESPA when it failed to provide that information or otherwise respond to the request for the entire account history.  SPS argues that Bivens's requests for information were overbroad and called for information he already had, and therefore it was not required to respond to those requests.  But SPS did not inform Bivens in writing that, pursuant to § 1024.36(f)(1), it was not required to respond to his QWR.  12 C.F.R. § 1024.36(f)(2).  If SPS was relying on those exceptions when it responded to his March 25, 2015 letter, it failed to do so in a manner that complies with Regulation X.  *See Mcmahon v. JPMorgan Chase Bank, N.A.*, No. 2:16-cv-1459-JAM-KJN, 2017 WL 1495214, at *5 (E.D. Cal. Apr. 26, 2017) ("But a servicer still has to notify the borrower of its determination that it is not required to comply with § 1024.36(d)."); *Martins v. Wells Fargo Bank, N.A.*, No. CCB-16-1070, 2016 WL 7104813, at *8 (D. Md. Dec. 6, 2016) ("[The servicer] never

22

mentioned in its . . . response or the accompanying documents the possibility that [plaintiff's requests were duplicative, and it did not provide a basis for this determination.").

SPS argues that Bivens's request for his account history from Bank of America is irrelevant because it is duplicative of information he already had and "was not likely to change." That argument is strained. The relevance exception refers to requests for information that information "not directly related to the borrower's mortgage account"—not where the servicer believes providing the information is unnecessary. *See* 12 C.F.R. § 1024.36(f)(1)(iii). The exception applies where the servicer has already provided the requested information to the borrower. *See* 12 C.F.R. § 1024.36(f)(1)(i). SPS has not pointed the Court to a case where the exception applies because the servicer knows the borrower already has the information from another source. That Bivens had not paid his mortgage in years and had an account history from another source is relevant to the question of damages, but SPS cannot use those facts as a *post hoc* rationale for its failure to fully respond to Bivens's request for his account history.

SPS argues that Bivens's request for the life-of-loan account history may be overbroad or unduly burdensome as a matter of law, but Regulation X provides that

23

a request is overbroad when "a borrower requests that the servicer provide an unreasonable volume of documents or information to the borrower."  12 C.F.R. § 1024.36(f)(1)(iv).  Similarly, a request is unduly burdensome "if a diligent servicer could not respond to the information request without either exceed the maximum time permitted by [Regulation X] or incurring costs (or dedicating resources) that would that would be unreasonable in light of the circumstances." *Id.*  Those inquiries clearly depend on the facts and circumstances of the request for information, and in this case, SPS has not shown why providing the account history from Bank of America and inquiring about the account history from MLN required an unreasonable volume of documents or excessive costs.

A reasonable factfinder also could find that SPS should have provided Bivens with a code sheet or some other means of understanding the Payment History Report it enclosed with its response to his March 25, 2015 letter.  Bivens requested an account history "showing the changes that have been made to the account."  (Bivens Dep. Ex. 3.)  The Court has reviewed the Payment History Report, and even with the code sheet, the Payment History Report is difficult to understand; without it, the nature of any changes to Bivens's account is anyone's guess.

The Court therefore finds that there is a genuine issue of material fact as to the first disputedelement of Bivens's RESPA claim: the procedural RESPA violation.   For the reasons that follow, however, he cannot show any actual damages from that violation.

**B.    Bivens cannot show actual damages based on SPS's failure to provide his account history from Bank of America and Mortgage Lenders Network or its failure to provide codes to interpret his account history.**

Under § 2605(f), a plaintiff may recover actual damages under RESPA and "any additional damages, as the court may allow, in the case of a pattern or practice of noncompliance with the requirements of this section."  As the Court previously concluded in this case [Doc. 17 at 9-12], and the Eleventh Circuit strongly suggested in *dicta* in *Renfroe*, 822 F.3d at 1247 n.4, a plaintiff cannot recover statutory damages without actual damages.  *See also Baez v. Specialized Loan Servicing, LLC*, __ F. App'x __, 2017 WL 4220292, at * 3 (11th Cir. Sept. 22, 2017).  Actual damages are a necessary element of a RESPA claim; without them, the claim fails.

To recover actual damages under RESPA, a plaintiff "must present specific evidence to establish a causal link between the financing institution's violation and [his] injuries." *McLean v. GMAC Mortg. Corp.*, 398 F. App'x 467, 471 (11th Cir.

25

2010) (affirming grant of summary judgment to financial institution on plaintiff's RESPA claim); *see also Baez*, 2017 WL 4220292, at * 3 (same).  Courts have held that costs such as photocopying and postage, incurred after a plaintiff receives an insufficient or incomplete response to a QWR, are actionable under RESPA. *Walker v. Branch Banking & Tr. Co.*, 237 F. Supp. 3d 1326, 1334 (S.D. Fla. 2017). There must be a "causal link," however, between the RESPA violation and Plaintiff's claimed damages.  *Renfroe*, 822 F.3d at 1246; *see also Baez*, 2017 WL 4220292, at *5.

Under the circumstances of this case, no reasonable factfinder could conclude that Bivens's claimed travel and fax expenses were caused by SPS's failure to provide him with a complete account history and a code sheet eight months before.  The Court explains the pertinent circumstances of the case below.

### 1.    Remoteness

Bivens's meeting with Rod Carnes and his follow-up correspondence with SPS are too remote in time from the original response to the March 2015 letter to suggest any causal connection between the events.  SPS responded to the letter on May 12, 2015, and it was clear from the face of the Payment History Report that (1) the document did not include the account statements of prior servicers and (2)

26

it was written partially in code.  Yet Bivens took no action to request information missing from the May 12 response or codes to help him understand the Payment History Report until February 2016, more than eight months later.  This is too remote to establish a causal link.  *See Reif v. Ocwen Loan Servicing, LLC*, No. 16-81546-CIV, 2017 WL 823867, at *3 (S.D. Fla. Feb. 22, 2017) (holding, with respect to a claim that defendant responded late to a request for information, that "[f]iling a [notice of error] months after receiving the requested information, and a few days before filing suit, does not create actual damages); *see also Pimenthal v. Ocwen Loan Servicing, LLC*, No. 16-CV-62089, 2016 WL 6678523, at *3 (S.D. Fla. Nov. 8, 2016).

At his deposition, Bivens was unable to articulate why he waited so long to request the missing information.  In the declaration submitted with his response to the motion for summary judgment, he explained that he waited because he "hoped" to obtain the documents during discovery in *Bivens II*.  While the Court must take as true that Bivens hoped to obtain the documents in discovery, he did not attempt to do so.  The docket in *Bivens II* shows that Bivens filed certificates of service for two requests for production of documents [*Bivens II*, Docs. 49, 64] and two motions to compel [*Bivens II*, Docs. 68, 74] after he received SPS's May 12 letter.  He did

27

not seek a complete account history or code sheet in either motion to compel. Bivens's subjective hope that the information might be disclosed in discovery is insufficient to create an issue of fact where he did not even ask for the information.

Finally, Bivens's assertion that SPS could have cured its deficient response to the March 25, 2015 letter during the eight months he waited to take action is of no moment.  The relevant question is whether Bivens was damaged, not whether SPS might have prevented his damages.  If Bivens means to suggest that he waited eight months because he hoped SPS would send the information on its own initiative, he has submitted no evidence to that effect.  His declaration specifically states that he did not send a follow-up request "immediately" after receiving the response to the March 25, 2015 letter because he hoped to get the documents in discovery in "the lawsuit that was ongoing at the time [*Bivens II*]."  (Bivens. Decl. ¶ 3.)

### 2.        Bivens's reasons for requesting an account history

Bivens's travel and fax expenses occurred *after* he filed this lawsuit, and he had to amend his complaint in order to adequately plead damages.  SPS makes much of the coincidental timing of first Bivens's follow-up request to SPS and a brief that SPS filed in *Bivens II* arguing that it was entitled to summary judgment,

in part, because Bivens failed to show actual damages.  It argues that the Court should infer that Bivens manufactured some of his damages for purposes of sustaining this lawsuit.  The Court cannot draw that inference at summary judgment, but the timing of Bivens's damages is significant for another reason: he believed he could prevail in this case based on a purely procedural RESPA violation.  It is clear from Bivens's testimony that he filed this lawsuit because he is unhappy with the quality of SPS's response to his March 25, 2015 letter.  But that dissatisfaction does not, without more, constitute actual damages.

Bivens argues that he needed the Bank of America account history[7] and the codes to his SPS account history, and he still needs the MLN account history, in order to understand his monthly statements and to know whether SPS is charging him correctly.  He testified that he requested an account history from SPS because

---

[7] As to SPS's failure to send an account history from Bank of America, Bivens possessed a Bank of America account statement by at least 2014, long before he sent the March 25, 2015 letter to SPS.  He cannot show that he was damaged because SPS failed to send him information he already had.  *Perron ex rel. Jackson v. J.P. Morgan Chase Bank, N.A.*, 845 F.3d 852, 858 (7th Cir. 2017) ("Simply put, [plaintiffs] weren't harmed by being in the dark because the lights were on the whole time.").  Any minor differences between the account statement had in 2014 and the one SPS sent him in 2016 are of no consequence because Bivens knew, when he requested his account history in March 2015 and in February 2016, that he already had a Bank of America account statement.  He just wanted to know what account history SPS had from Bank of America.

he wanted to understand his monthly statements from SPS, he did not think it was appropriate for SPS to send him a monthly statement if it did not have a complete account history, and he wanted to see what information SPS had in its possession. The last two points are related to Bivens's belief that SPS may not be able to service his loan if it cannot verify his debt.  Bivens cannot claim to be damaged by SPS's failure to request account statements from his prior servicers when the point in asking for his account statement was to test what information SPS had.  Bivens also has not made clear what he does not understand about his monthly billing statements or what error there might be in his account; he just wants to check. Under the unique circumstances of this case, where Bivens did not evince any suspicion that there was an error in his account until after he stopped making payments, his mere speculation that there may be an error is not enough to show a causal link between the May 12, 2015 response and his claimed damages.

To that end, Bivens's interest in any of this information—in having his Bank of America and MLN account histories, and in being able to understand his SPS account history—is belied by his long-term refusal to make loan payments.  He had not made a payment in five years when he sent the March 25, 2015 letter.  If he ever begins making payments or the property is sold, he may need to understand

30

SPS's Payment History Report, or he may wish to make an issue of the fact that SPS does not have an account statement from MLN.  But for the period at issue in this lawsuit, Bivens was in no danger of overpaying on his loan, paying an erroneous charge, or having a payment misapplied.

Put another way, a borrower struggling with her monthly loan payments might be legitimately frustrated if her servicer sent her a partial, hard-to-understand account statement written half in code, and she had to send follow-up requests for information or ask for help in understanding the account.  But Bivens does not suggest that he intends to pay SPS, or that he would begin making payments if he had a more complete account history.  He even denies that he owes any money to SPS, and he seems to be convinced that there is a technical problem with his loan or security deed that will absolve him of making payments to SPS or making payments at all.  (*See* Bivens Dep. at 33, 86.)

In sum, Bivens cannot show that he was damaged by SPS's May 12, 2015 response because he incurred costs in sending follow-up requests to SPS and traveling to ask Deputy Commissioner Carnes for help understanding his account summary because: those subsequent expenses were too remote from the May 12 response; Bivens sent the request to see what information SPS had in its possession;

31

his suspicion that there is an error in his account is speculative; and he cannot be damaged by his failure to understand his account without showing how he might be damaged by a misapplied payment or erroneous charge.

    **C.**    **Bivens's argument that SPS's response to his March 25, 2015 letter was deficient because it did not include useful contact information is not properly before the Court, and he cannot show actual damages based on that deficiency.**

    In his response to the motion for summary judgment, Bivens argues that SPS's response to his March 25, 2015 letter was also deficient because it did not include the name and telephone number of an SPS employee who can provide him with assistance.  [Doc. 68 at 16-18.]  RESPA requires that a servicer responding to a QWR provide the borrower with "the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower."   12 U.S.C. § 2506(e)(2)(C)(ii).   Bivens acknowledges that the March 25, 2015 letter provided contact information for a Relationship Manager at SPS, but he complains that when he contacts SPS's customer service department he is transferred to the legal department because his account status is "in litigation."  [Doc. 68 at 17.]  In the legal department, no one can speak with him because he is represented by counsel.  [*Id.*]

For starters, Bivens's claim about SPS's failure to provide appropriate contact information is outside the scope of his amended complaint. [*See* Doc. 29.] He cannot raise the issue for the first time in his response to the motion for summary judgment. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004).

In any event, Bivens cannot show that he has been damaged by SPS's failure to provide contact information for a customer service representative who is authorized to speak to him. Bivens does not suggest that he calls SPS's customer service line because he wants to make mortgage payments. He calls SPS to dispute his account and to inquire about his litigation. (*See* Feb. 2017 Syphus Dep. Ex. 3 [Doc. 70-3] (Bivens's Contact History Report)). Bivens is in active litigation with SPS, so it should come as no surprise that his calls are transferred to the legal department. If he wants to discuss litigation or dispute his account with SPS, he has the option to do so through counsel. He also has not indicated how SPS's failure to provide him with a useful phone number is linked to any of his claimed damages, namely, the travel expenses to his meeting with Deputy Commissioner Carnes and his expenses associated with sending follow-up correspondence to SPS.

Finally, the Court adds that Bivens's behavior in this case has undermined the purpose of § 2605.  RESPA opens communication between borrowers and loan servicers by requiring loan servicers to respond to borrowers' QWRs.  *See* 12 U.S.C. § 2605(e).  Bivens testified that he has sent SPS "three dozen or so QWR[s]."  (Bivens Dep. at 103.)  He has inundated SPS with RESPA-related communications and sued SPS four times over perceived deficiencies in its responses.  Rather than opening communication between him and SPS, his incessant RESPA requests and lawsuits have stifled communication.  He now complains that no one at SPS will talk to him except through counsel, but that is a consequence of his numerous QWRs and lawsuits.  His complaint about SPS's reluctance to speak with him is therefore unavailing.  *See Russell v. Nationstar Mortg., LLC*, No. 14-61977-CIV, 2015 WL 5819663, at *8 (S.D. Fla. Oct. 6, 2015) ("Congress could not have intended for § 2605(e)(2) to operate in hindsight as a 'gotcha'—essentially enabling borrowers to tie the hands of loan servicers 'by inundating a lender with qualified written requests until they receive a single unsatisfying response.'").

### D.     Bivens's RESPA claim fails as a matter of law.

In sum, there is a genuine issue of material fact as to whether SPS violated RESPA, as a procedural matter, by responding to his March 25, 2015 letter with an incomplete account history written partially in code.  No reasonable factfinder would conclude, however, that Bivens could show actual damages from the arguably deficient response.  Because he cannot show actual damages, his RESPA claim fails as a matter of law.  Moreover, Bivens's argument about SPS's failure to give him appropriate contact information is not properly before the Court and is without merit.

## V.     CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that SPS's motion for summary judgment be **GRANTED**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned.

IT IS SO RECOMMENDED this 18th day of December, 2017.

_____

JOHN K. LARKINS III
United States Magistrate Judge

35